**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA

VERSUS

JOHN LEAGARD

CRIMINAL ACTION

20-53-SDD-RLB

## RULING

This matter is before the Court on the *Motion to Suppress Evidence*[1] filed by Defendant, John Leagard ("Leagard" or "Defendant"). The Government filed an *Opposition*[2] to the *Motion*, and a hearing was held on January 13, 2021.[3] For the reasons that follow, the Court finds that the *Motion* shall be DENIED.

**I.     FACTUAL BACKGROUND**

Just before 6:00pm on February 18, 2020, officers with the Baton Rouge Police Department's (BRPD) Street Crimes Unit converged at the intersection of Atkinson and Convention Streets in Baton Rouge, Louisiana. The officers were acting on a tip that a group of individuals was imminently gathering at that location to engage in gunfire (more on the contents and origin of the tip *infra*). Defendant herein, John Leagard, was among the individuals standing in the yard of 211 Atkinson Street when the officers arrived. BRPD Sergeant David Kennedy ("Sgt. Kennedy") made contact with Leagard and, during their brief interaction, discovered a .38 caliber revolver in Leagard's front waistband. Leagard was arrested and placed in the back of a patrol unit. BRPD officers then learned that Leagard was a convicted felon with an active

---

[1] Rec. Doc. No. 15.
[2] Rec. Doc. No. 26.
[3] Rec. Doc. No. 44.
64907

warrant and booked him into East Baton Rouge Parish Prison for being a felon in possession of a firearm. The instant prosecution ensued; Leagard was indicted on September 2, 2020 for violating 18 U.S.C. § 922(g)(1).[4] This *Motion to Suppress* was filed on October 23, 2020.

Defendant urges that "any and all evidence obtained from this warrantless search and seizure should be suppressed,"[5] but his position is at times unclear. On one hand, he "acknowledges that a brief stop. . .would have been permissible under *Terry* and its progeny"[6] and that a "pat down, or frisk of John Leagard's outer clothing for the purposes of officer safety would [likewise] be permissible."[7] In the same brief, however, he questions the officers' basis for reasonable suspicion and argues that "there was no justification for the search."[8] At the hearing, the defense offered a twofold argument for suppression: first, the tip that that brought officers to the corner of Atkinson and Convention Streets was anonymous and had insufficient indicia of reliability, and second, the search of Leagard's person was improper because the body camera footage from the scene demonstrates that Leagard "was simply standing in a yard with others, which is certainly not a crime," and that Leagard "was not acting suspicious in any way."[9] Moreover, the defense argued, even if a *Terry* pat down was legal, Sgt. Kennedy went beyond the bounds of *Terry* when he raised Leagard's shirt.

---

[4] Rec. Doc. No. 1.
[5] Rec. Doc. No. 15, p. 2.
[6] Rec. Doc. No. 15-2, p. 8.
[7] *Id.*
[8] *Id.* at p. 12.
[9] Rec. Doc. No. 15, p. 2.
64907

The Government disputes all aspects of Leagard's argument. Far from being anonymous and unreliable, it argues, the tip upon which officers relied was from a known informant and provided "reliable and real-time information indicating imminent gun violence."[10] And, even if Leagard was "walking in the direction of the arresting officer," he was "intentionally walking away from" certain other officers on the scene. Overall, the Government contends that reasonable suspicion existed because (1) the location of the interaction is a "known high crime area";[11] (2) the tip gave officers reason to believe that Defendant and others were armed; and (3) Leagard's behavior, specifically "attempting to disengage from the group to avoid contact with any officers,"[12] was suspicious. The Government also rejects the contention that raising Leagard's shirt ran afoul of *Terry*, noting that Fifth Circuit precedent establishes that doing exactly that is permissible under *Terry*.[13]

## II.    LAW

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."[14] However, "there are several situations where the burden shifts to the government."[15] For instance: "where the facts are undisputed that the arrest and seizures were made without benefit of warrants of any kind, we hold the government bears the burden of proving it had reasonable suspicion to seize"[16] the defendant. Here,

---

[10] Rec. Doc. No. 26, p. 1.
[11] *Id.* at p. 3.
[12] *Id.* at p. 6.
[13] *Id.* at p. 8 (citing *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003)).
[14] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014)
[15] *United States v. De La Fuente,* 548 F.2d 528, 533 (5th Cir.), *cert. denied* 431 U.S. 932 (1977).
[16] *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).
64907

Leagard argues that the firearm in his possession was discovered via an illegal search. Warrantless searches and seizures are presumptively unreasonable, subject to certain exceptions.[17] One exception provides that "officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot."[18]

"Reasonable suspicion exists if the officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime. It cannot be unparticularized or founded on a mere hunch."[19] "[R]easonable, individualized suspicion that someone being stopped for brief questioning is armed and dangerous must exist before the officer may conduct a pat-down."[20] "[E]ven if an officer is justified in making a brief investigatory stop, 'to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.'"[21] The Fifth Circuit has described the standard for justifying a pat-down as being "more onerous" than that for the initial stop.[22]

Whether the officer had a "particularized and objective basis for suspecting legal wrongdoing" requires an assessment of the totality of the circumstances.[23] Certainly, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis."[24] But, a person's "presence in an area of expected

---

[17] *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014).
[18] *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (*en banc*) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)).
[19] *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020)(internal citations and quotations omitted).
[20] *Id.*, citing *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990).
[21] *Arizona v. Johnson*, 555 U.S. 323, 326-7 (2009).
[22] *Monsivais*, 848 F.3d at 357 n.1.
[23] *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002).
[24] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).
64907

criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[25] The Fifth Circuit has held that "nervous behavior" is "supportive of a reasonable suspicion."[26] Likewise, "unprovoked flight."[27] In the recent case *United States v. McKinney,* the Fifth Circuit considered whether a woman who "appears to slowly walk away from the group, but . . .immediately complie[s] with the officer's order to return"[28] acted in such a way as to give officers reasonable suspicion. The court was skeptical that she did, noting that such conduct was less suspicious than outright flight, especially where there was "no indication that her conduct caused the officers to fear for their safety."[29]

Reasonable suspicion need not be "based on a personal observation. It can be based on information provided by a confidential informant, if the information possesses 'an indicia of reliability.'"[30] The Fifth Circuit evaluates whether an informant's tip provides reasonable suspicion based on several factors, including:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.[31]

An *anonymous* tip that provides verifiable information as to a person's identity and location, without more, is insufficient to justify an investigative stop.[32] "As [the United States Supreme Court] ha[s] recognized, however, there are situations in which an

---

[25] *Id.*
[26] *McKinney*, 980 F.3d 485 at 495.
[27] *Id.*, citing *Wardlow*, 528 U.S. at 124–25.
[28] *United States v. McKinney*, 980 F.3d 485, 495 (5th Cir. 2020).
[29] *Id.*
[30] *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993).
[31] *United States v. Thompson*, No. CR 17-225, 2018 WL 1251610, at *6 (E.D. La. Mar. 12, 2018), aff'd, 783 F. App'x 360 (5th Cir. 2019)(citing *United States v. Martinez*, 486 F.3d 855, 860 (5th Cir. 2007).
[32] *Florida v. J.L.,* 529 U.S. 266 (2000).

64907

anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"[33] Tips from known informants are preferred because "[w]hen the informant is known, her 'reputation can be assessed,' and she can 'be held responsible if her allegations turn out to be fabricated.'"[34]

## III.   ANALYSIS

### a. The Tip

Based on the evidence brought forth at the hearing, the Court finds that the tip that led BRPD officers to the corner of Atkinson and Convention Streets was neither anonymous nor unreliable. Louisiana State Police ("LSP") Master Trooper Jeremy Ballard ("Master Trooper Ballard" or "Ballard") testified that he received the tip from a "State Police confidential informant" with whom he had previously worked on "at least three cases in a two-year period," adding that he received information from this informant "multiple times for each case and [he] wasn't the only one" in LSP with whom the informant shared information.[35] Master Trooper Ballard testified that, in his experience, this particular informant is reliable. In fact, he testified that he could not recall any instances where this informant's information was proven to be *unreliable*. Although there have been instances where the information could not be confirmed, Master Trooper Ballard did not attribute that to any dishonesty or unreliability on the part of the informant, stating again that he found this informant to be reliable based on the information he or she has previously provided to LSP. Thus, although the actual identity of the confidential informant was unknown to BRPD officers who responded to the scene, the tip was not anonymous.

---

[33] *Id.* at 270.
[34] *United States v. Martinez*, 486 F.3d 855, 862 (5th Cir. 2007)(citing *Florida v. J.L.,* 529 U.S. 266).
[35] Testimony of Master Trooper Jeremy Ballard, hearing held January 13, 2021.
64907

When the informant called Master Trooper Ballard on the evening of February 18, 2020, he or she reported that there was a group of people who had firearms and that there was "going to be a shooting, soon."[36] Ballard understood from the tipster that the events described were unfolding in real time and that the tipster may have been on or near the scene, though he was not certain. At the hearing, Ballard could not recall all of the details of the tip, but he testified that when he received it, he immediately contacted a BRPD officer he knew, Detective Zac Woodring ("Detective Woodring" or "Woodring"), to get the information into the hands of BRPD so that they could respond.

Detective Woodring testified at the hearing that Master Trooper Ballard called him and then sent him a text message relaying the information from the informant's tip. The text message exchange between Ballard and Woodring was introduced into evidence[37] and reflects that Ballard sent the following shortly before 6:00pm:

> Gray Lincoln car guy has red shirt. They at a house that burned down. Let me know if they get anything good so I can pay my rat

Detective Woodring testified that Ballard told him the information was from a confidential informant from whom Ballard had received information in the past. Further, after speaking with Ballard, Detective Woodring was under the impression that Ballard had received the

---
[36] *Id.*
[37] Government's Exhibit 5.
64907

information "moments prior to contacting" Woodring.[38] Detective Woodring's testimony established that he passed the information from the text message along to Sergeant David Kennedy with the BRPD Street Crimes Unit, copy-and-pasting directly from Ballard's original message. That exchange was substantiated by the introduction into evidence of Woodring's text messages to Kennedy:[39]



Body camera footage and the testimony of Sgt. David Kennedy, who, along with the officers of the Street Crimes Unit proceeded to the location given by the tip, establish that the information from the tip was verified by officers on the scene in several respects. First, as indicated by the tip, the responding officers encountered a group of individuals gathered at the corner of Atkinson and Convention Streets. A gray Lincoln was parked at the scene, and one of the individuals was wearing a red shirt. The house next door to 211 Atkinson Street appears from the body camera footage to have sustained fire damage. Overall, the specificity of the information in the tip, and the extent to which officers were

---

[38] Testimony of Detective Zac Woodring, hearing held January 13, 2021.
[39] Government's Exhibit 6.
64907

able to verify it, suggest that the tip had indicia of reliability, as does the fact that the confidential informant was not anonymous but rather an established informant with a track record of reliability. Moreover, the record reflects that the tip was hardly stale when BRPD acted on it; no more than ten to fifteen minutes elapsed between Master Trooper Ballard receiving a call from his informant and the BRPD officers arriving on the scene.

While the Court finds that the tip had indicia of reliability and that officers validly acted on the tip, it also finds that the tip itself was insufficient to give officers particularized reasonable suspicion as to John Leagard. In *United States v. Roch*, the Fifth Circuit considered the following tip, provided to law enforcement by a confidential informant: "a man named Frank planned to pass some forged checks and threatened to kill the next cop he saw. According to the informant, Frank possessed two guns, drove a white and orange pickup truck, and was staying in a local motel room with his girlfriend. The informant described him only as a blond, white male with tattoos on large portions of his body."[40] The Fifth Circuit found this tip to be "significantly less detailed than other situations where reasonable suspicion has been found." In *United States v. Martinez*, the Fifth Circuit expounded on *Roch*, explaining that a tip does not provide reasonable suspicion just because certain facts may be corroborated by law enforcement. "That the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts, does not provide any basis for executing a *Terry* stop on that person. If it did, then *Terry* itself would be a dead letter. Only when the police have a reasonable basis to suspect *criminal* activity can they justifiably conduct an investigative stop."[41]

---

[40] *United States v. Roch,* 5 F.3d 894, 896 (5th Cir. 1993).
[41] *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007).
64907

The Supreme Court and the Fifth Circuit have held that tips that contain "predictive information"[42] about the future actions of its subject are more likely to give rise to reasonable suspicion. The tip in this case predicted imminent gunfire; whether that was correct or not is unknown. It is possible that the tip was predictive and that officers' arrival on the scene *prevented* the allegedly imminent gunfire. In any event, while the tip was sufficiently reliable to provide a valid basis for law enforcement officers to proceed to the scene, under the standards articulated by the Fifth Circuit, the tip alone was not enough to provide particularized reasonable suspicion as to John Leagard.

### b. *Terry*

While the tip may have contributed to officers' reasonable suspicion as they arrived at Atkinson and Convention, even a limited *Terry* search of John Leagard's person could not be proper unless officers developed reasonable suspicion as to him, specifically. Indeed, the Supreme Court has held that a person's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[43]

The Court finds that, based on the testimony of BRPD Sergeant David Kennedy, along with the video from Sgt. Kennedy's body-worn camera, Kennedy had reasonable suspicion to stop and perform a *Terry* pat down on Leagard. The evidence in support of a finding of reasonable suspicion is as follows. 211 Atkinson Street is a corner lot, with frontage on both Atkinson and Convention Streets. As BRPD officers positioned themselves along the perimeter of the yard and began making contact with the individuals

---

[42] *United States v. McKnight*, 469 F. App'x 349, 355 (5th Cir. 2012).
[43] *Illinois v Wardlow*, 528 U.S. 119, 124 (2000).
64907

standing there, Leagard walked away from the officers on the Atkinson Street side of the yard and toward the house, where he encountered Sergeant David Kennedy. Kennedy was standing between the house and a large tree, blocking Leagard's path. The defense argued that Leagard's behavior could hardly be suspicious since the video depicts him walking directly *toward* Sgt. Kennedy. Based on a close review of the video combined with Sgt. Kennedy's testimony, however, the Court concludes that, in fact, Leagard appears to walk toward Kennedy only because he was trying to avoid contact with other officers on the scene, who had effectively surrounded him. Moreover, although Leagard undisputedly walks in Kennedy's direction, his body language suggests that he was not approaching Kennedy but rather trying to get to the house. Sergeant Kennedy testified that, in his opinion, Leagard's behavior and, based on his experience, evinced an attempt to avoid making contact with officers. This assessment is supported by the video evidence, which shows that Leagard almost walked past Sgt. Kennedy and did not stop even after Kennedy said "How you doin'?" and "Where you goin'?"[44]

Sgt. Kennedy then told Leagard "Stay over here," at which point Leagard said "alright" and turned his back to Sgt. Kennedy and continued to move restlessly, further indicating officer avoidance. Sgt. Kennedy said "Chill out" and grabbed the back of Leagard's shirt. At the hearing, Sgt. Kennedy credibly testified that he grabbed the shirt not to initiate a *Terry* search but because it was his impression that Leagard was being evasive and trying to walk away and that grabbing the shirt would arrest his movements.

---

[44] Government's Exhibit 1B.
64907

Overall, the record developed at the hearing establishes that, based on the totality of the circumstances, Sgt. Kennedy had multiple specific and articulable facts that gave rise to reasonable suspicion as to Leagard. First, as he noted in his testimony, the location of the tip is a high crime area,[45] which the Supreme Court has held to be "among the relevant contextual considerations in a *Terry* analysis."[46] He testified that multiple aspects of the tip were corroborated by what he observed. And, when Sgt. Kennedy noticed John Leagard, he observed that he was walking on a path that took him away from several other officers. That, combined with the fact that Leagard turned away from Kennedy and would not stand still after being asked to do so, gave Kennedy the impression that "criminal activity [was] afoot."[47] The Defendant concedes the constitutional propriety of the *Terry* stop and the Court finds that Sgt. Kennedy had reasonable suspicion to stop Leagard based on their interaction taking place in a high crime area, his knowledge of a reliable tip suggesting the presence of armed individuals on the scene, and Leagard's behavior which, based on Sgt. Kennedy's extensive experience as an officer, was characteristic of someone trying to avoid law enforcement contact.

Of course, having reasonable suspicion to stop Leagard did not automatically give Sgt. Kennedy reasonable suspicion to frisk him: "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."[48] Sgt. Kennedy testified that he did not perform a frisk or a pat down and that the revolver was discovered only because, when Kennedy grabbed Leagard's shirt,

---

[45] Testimony of Sgt. David Kennedy, hearing held January 13, 2021.
[46] *Illinois v Wardlow*, 528 U.S. 119, 124 (2000).
[47] *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (*en banc*) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)).
[48] *Arizona v. Johnson*, 555 U.S. 323, 326-7 (2009).
64907

Leagard's evasive movements caused the shirt to rise, revealing the gun in his front waistband. Assuming *arguendo* that Sgt. Kennedy's actions amounted to a patdown under *Terry*, the Court finds that, even applying the "more onerous" standard of reasonable suspicion required to support a frisk, Sgt. Kennedy had the requisite reasonable suspicion to pat down Leagard. The defense concedes as much,[49] and the Court finds that once Sgt. Kennedy observed the gray Lincoln and the man in a red shirt, as he testifies that he did, it was reasonable for him to suspect that the rest of the tip, which suggested the individuals on the scene were armed and preparing to exchange gunfire, was accurate as well.

After conceding that Sgt. Kennedy's stop and frisk of Leagard was based on reasonable suspicion, the defense contends that the search was nevertheless improper because lifting Leagard's shirt exceeded the scope of the limited pat down search authorized by *Terry*. As an initial matter, the Court finds Sgt. Kennedy's testimony credible where he stated that he never actually performed a *Terry* pat; he discovered the weapon when his means of effectuating a *Terry* stop (grabbing Leagard's shirt) had the unintended consequence of exposing Leagard's weapon. Assuming for purposes of the analysis that a *Terry* pat did occur, the Court finds that Fifth Circuit precedent clearly locates lifting a suspect's shirt within the bounds of *Terry*.

In *United States v. Reyes*, the Fifth Circuit considered "whether asking a suspect to empty his pockets and raise his shirt is more intrusive than the frisk permitted in *Terry*

---

[49] Rec. Doc. No. 15-2, p. 8 ("The Defense acknowledges that a brief stop of John Leagard would have been permissible under Terry and its progeny. Defense also acknowledges that a pat down, or frisk of John Leagard's outer clothing for the purposes of officer safety would be permissible during a brief stop under Terry").
64907

and therefore prohibited by the Fourth Amendment."[50] The court concluded that it was not, reasoning:

> *Terry* does not in terms limit a weapons search to a so-called 'pat-down' search. Any limited intrusion designed to discover guns, knives, clubs or other instruments of assault are [sic] permissible. Thus, the raising of a suspect's shirt by a law enforcement officer does not violate the boundaries established in *Terry*. Neither does directing a suspect to lift his shirt to permit an inspection for weapons; a request that a suspect lift his shirt is less intrusive than the patdown frisk sanctioned in *Terry*.[51]

The defense argued at the hearing that *Reyes* is not controlling here because the facts are clearly distinguishable insofar as in *Reyes*, the law enforcement officer *asked* the suspect to lift his shirt. On this point, the Court cannot disagree. However, the Court notes that the Fifth Circuit's language in *Reyes* clearly demonstrates that its holding encompasses both scenarios – a suspect being asked to raise his shirt and a law enforcement officer lifting the shirt without asking. A plain reading reveals this to be the case; after stating that that "the raising of a suspect's shirt by a law enforcement officer does not violate the boundaries established in *Terry*,"[52] the *Reyes* court went on to say that "[n]either does directing a suspect to lift his shirt to permit an inspection for weapons."[53] If the *Reyes* court intended for its holding only to extend to situations where there is a *request* to lift the shirt, the "neither" statement, which posits the request scenario as *another* example of permissible conduct under *Terry*, would not be necessary. Because the Fifth Circuit saw fit to include the statement, this Court concludes that it had

---

[50] *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003).
[51] *Id*. (internal quotations and citations omitted).
[52] *Id.* at 225.
[53] *Id.*

64907

a purpose, and that the purpose was to express that neither lifting a shirt without a request nor lifting a shirt *with* a request violate *Terry*.

That *Reyes* stands for the proposition that any raising of a shirt is permissible under *Terry* is reinforced by the Fifth Circuit's holding in *United States v. Jackson*.[54] In *Jackson*, the defendant was discovered on a Greyhound bus with cocaine strapped to his waist – cocaine that law enforcement officers discovered by "lifting Jackson's shirt after feeling objects at his waist."[55] The court held that the cocaine was admissible on the basis of the "plain-feel doctrine," but noted that there was no need to rely on that doctrine to conclude that the search was lawful, in light of the general principle from *Reyes* that "the raising of a suspect's shirt by a law enforcement officer does not violate the bounds established by *Terry*."[56] "Thus," the court concluded, "the officers were within their constitutional authority when they raised Jackson's shirt, an act that in turn led to the discovery of the cocaine and Jackson's arrest."[57] In *Jackson*, the Fifth Circuit applied *Reyes* to a case where officers did not ask the suspect to raise his shirt, but raised it themselves, bolstering this Court's interpretation of *Reyes* as applicable to both scenarios.

Overall, the Court concludes that the Government has successfully carried its burden of proof by showing, based on the totality of the circumstances, which included a credible and relatively specific tip and Leagard's evasive behavior during an encounter in a high crime area, that BRPD Sgt. Kennedy had reasonable suspicion to execute a *Terry* stop and pat down on Leagard. Additionally, the Court finds that, based on relevant Fifth

---

[54] 390 F.3d 393.
[55] *Id.* at 399.
[56] *Id.*
[57] *Id.*
64907

Circuit precedent, Sgt. Kennedy did not exceed the bounds of *Terry* when he grabbed Leagard's shirt, causing it to lift up and expose the weapon. Accordingly, the Court finds that the .38 caliber revolver discovered on Leagard's person was not obtained in violation of his Fourth Amendment rights and is admissible as evidence in this case.

## IV.   CONCLUSION

For the above reasons, Defendant John Leagard's *Motion to Suppress*[58] is hereby DENIED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>January 25, 2021</u>.

*Shelly D. Dick*
_____

**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[58] Rec. Doc. No. 15.

64907